# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

MARQUIS GREEN,

    Plaintiff,

    v.

CASEY CAMPBELL,
LT. RICHARD HAGUE,
FIVE JOHN DOES,
THREE TOLL SHIFT
  CONTROL OFFICERS,

    Defendants.

Civil Action No.: GJH-20-2527

## MEMORANDUM OPINION

In response to this civil rights action filed by pro se Plaintiff Marquis Green, Defendants filed a Motion to Dismiss or for Summary Judgment. ECF No. 17. Green opposes the motion. ECF No. 21. No hearing is necessary. *See* Local Rule 105.6 (D. Md. 2021). For the reasons stated below, Defendants' motion shall be granted in part and denied in part.

## Background

A.    <u>Plaintiff's Allegations</u>

Green, who was at all times relevant[1] to this complaint incarcerated in Roxbury Correctional Institution ("RCI"), alleges he was assaulted by another inmate on February 28, 2020 at approximately 8:30 p.m., in housing unit ("HU") 5A. ECF No. 1 at 2. Green states that his assailant cut him with a homemade knife, requiring him to receive stitches to his face, mouth and hands. *Id.*

---

[1]    Green was transferred to a minimum-security facility in Sykesville, Maryland shortly after he filed the complaint in this Court. As a consequence, any need for injunctive relief prohibiting Green being assigned to general population with inmates who present a threat to his safety at RCI is moot.

Following the assault and his return from the hospital, Green was placed on disciplinary segregation pending adjustment. ECF No. 1 at 3. On March 3, 2020, after he was found not guilty, Green was released from disciplinary segregation back to general population. *Id.* He did not feel safe returning to general population and asked to speak with Defendant Lt. Richard Hague,[2] a member of the Intelligence Unit. *Id.* When Green told Hague he didn't feel safe, Hague reassured him that he "knew everything that goes on in this prison" and that Green would "not be harmed." *Id.* With that reassurance, Green walked to his new housing unit.

Before Green could get on the tier where his assigned cell was located, he claims an inmate made a "threatening gesture" by "putting his finger across his throat." ECF No. 1 at 3. Green informed the tier officer that he was refusing housing because of the threat. *Id.* Green was then escorted back to disciplinary segregation for refusing housing where he remained until March 15, 2020. *Id.*

When Green was again due to be released from disciplinary segregation on March 15, 2020, he refused to go back to general population and Hague was called. ECF No. 1 at 3. Green explained to Hague that he was scared he would be assaulted again if he returned to general population. *Id.* Green claims that Hague dismissed his concerns, told him he didn't want to hear it, and threatened him with a transfer to North Branch Correctional Institution, where Green would "really have something to be scared of." *Id.* Green feared that Hedge would follow through with the threat and complied with orders to return to general population. *Id.*

Two days later, Green was asleep in his cell on cell restriction when "multiple people" came into his cell, put a sheet over his head, and beat him unconscious. ECF No. 1 at 3. After regaining consciousness, Green walked directly to the "bubble" to alert the officers there that he

---

[2]     The Clerk will be directed to correct the spelling of Lt. Hague's name.

had been assaulted. *Id.* Green alleges that the officers simply laughed and waived him off. *Id.* Green then walked to the dispensary, bleeding from his face. *Id.*

Upon his arrival to the dispensary, Green was transported to an area hospital for treatment of his injuries. ECF No. 1 at 3. Green states he suffered two fractured eye sockets and a fractured right arm. *Id.* at 3-4. Additionally, the injury to Green's right eyelid required stitches. *Id.* at 4.

As relief, Green seeks declaratory judgment requiring better training and better supervision of inmates. ECF No. 1 at 5. Additionally, he seeks compensatory damages for the mental and physical injuries he suffered and punitive damages. *Id.*

B.    Defendants' Response

Defendants Warden Casey and Lt. Hague acknowledge that Green was assaulted on the two occasions he alleges. ECF No. 17.

On February 8, 2020, Officer Rex Clark who was stationed in HU 5, witnessed inmate Tanner Johnson swinging a white plastic toothbrush handle with two razor blades attached at Green. ECF No. 17-2 at 4 (Incident Notes from Dispatch). Clark dispensed pepper spray to end the fight; both inmates were taken to the infirmary for an evaluation. *Id.* Green was taken by State van to Meritus Medical Center where he received sutures for his wounds. *Id.* Neither Johnson nor Green cooperated with an investigation of the assault; both men were charged with rule violations. *Id.* Johnson was placed on Green's enemies list on March 3, 2020. ECF No. 17-3 at 2.

Detective Sergeant Pressman investigated the incident. ECF No. 17-2 at 5-6. Pressman reviewed the "Offender Case Management System" or OCMS reports for Johnson and Green; neither man was a member of a Security Threat Group ("STG"). *Id.* at 5. When Pressman attempted to interview Green on March 3, 2020, Green refused to speak to Pressman. *Id.* at 6.

Pressman reviewed the institutional reports concerning the incident after speaking with Officer Clark and determined that Clark's report was consistent with the institutional reports. *Id.*

On March 4, 2020, Pressman applied for criminal charges against Johnson in the State district court. ECF No. 17-2 at 6. Johnson was charged with possession of a weapon while confined and carrying a concealed weapon. *Id.*, *see also id.* at 31-32. When the charging statement was served on Johnson by Detective Sergeant Fagan the following day, Johnson offered no statements. ECF No. 17-2 at 6.

Captain Jerold Ambrose contacted the Intelligence and Investigative Division ("IID") on March 17, 2020 to report that Green had been assaulted in his cell by unknown inmates. ECF No. 17-2 at 48. Green's cell door was opened for recreation when his assailants gained entry to his cell. *Id.* Following the assault, Green refused to provide a statement or give any information about his attackers but advised that no weapons had been used. *Id.* Green was transported to the hospital because medical staff determined he needed x-rays. *Id.* Although the portion of the report attached to Defendants' motion indicates that pictures were taken of Green's cell, those pictures were not included with the exhibits. *Id.* Further, no serious incident report was prepared and no information regarding the nature of Green's injuries is provided. Green was placed on administrative segregation when he returned to RCI pending his transfer to another prison. ECF No. 17-3 at 5; ECF No. 17-4 at ¶ 4.

Defendant Lt. Hague provides in his declaration that when he initially interviewed Green after the February 28, 2020 assault, Green claimed he did not know why Johnson assaulted him. ECF No. 17-5 at ¶ 4. However, when Hague interviewed Green again on March 3, 2020, Green told Hague that he owed money to the STG known as Dead Men Incorporated or "DMI" but did not state any concerns for his safety at that time. *Id.* Hague further maintains that neither he nor

the Investigations/Intel Office received any communication from Green prior to the March 17, 2020 incident that "would support a finding of a credible threat or danger to Marquis Green's safety or a basis to change his housing status." *Id.* at ¶ 5.

Michael Lichtenberg, who is the Assistant Warden at RCI, asserts in his declaration that no information was received in the Warden's office before March 17, 2020 indicating that Green's life was in danger. ECF No. 17-6 at ¶ 4. The declaration is silent regarding the first attack on Green.

### C.   Green's Opposition

Green states in his affidavit that he "should have been sent to administrative segregation after [he] was stabbed the first time." ECF No. 21 at 2. He further claims that he refused housing on March 3, 2020 because he was afraid he would be stabbed again, which is documented in the Notice of Inmate Rule Violation he received for refusing housing. *Id.* at 3. He alleges he was forced to go into general population on March 15, 2020 and "had to get assaulted a second time for RCI officers to act." *Id.* He further states that "RCI officers had full knowledge that [he] could be assaulted again after [he] told them but they did nothing to ensure [his] safety." *Id.*

**Standard of Review**

### A.   Motion to Dismiss

In reviewing the complaint in light of a Motion to Dismiss pursuant to Fed. R. Civ. Proc. 12(b)(6) the court accepts all well-pleaded allegations of the complaint as true and construes the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. *Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)); *Ibarra v. United States,* 120 F.3d 472, 473 (4th Cir. 1997). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only a "short and plain

statement of the claim showing that the pleader is entitled to relief." *Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321, 325-26 (4th Cir. 2001); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002) (stating that a complaint need only satisfy the "simplified pleading standard" of Rule 8(a)).

The Supreme Court of the United States explained a "plaintiff's obligation to provide the "grounds" of his "entitlement to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). Nonetheless, the complaint does not need "detailed factual allegations" to survive a motion to dismiss. *Id.* at 555. Instead, "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.* at 563. To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not 'show[n]' -- 'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

"[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly*, 550 U.S. at 563 (citing *Sanjuan v. Am. Bd. of Psychiatry and Neurology, Inc.*, 40 F.3d, 247, 251 (7th Cir. 1994)) (once a claim for relief has been stated, a plaintiff 'receives the benefit of imagination, so long as the hypotheses are consistent with the complaint').

B.    Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The Court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002).  Importantly, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

The Court maintains an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).  "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting Fed. R. Civ. P. 56(e)).  A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 249-50.

### Discussion

Defendants allege that they are immune from suit in their official capacities; the complaint does not state sufficient facts against them; Warden Campbell did not personally participate in any wrongdoing; they are entitled to qualified immunity; and there is no basis for an Eighth

Amendment claim for failure to protect Green from violence. ECF No. 17-1. As there is no indication in the complaint that Green is suing Defendants in their official capacities, the complaint is construed as raising only personal capacity claims. Further, the claim asserted by Green, a failure to protect him from violence despite his warnings that he was in danger of being assaulted, is a clearly established constitutional claim so that the qualified immunity defense is without applicability. The remaining assertions by Defendants are addressed below.

A.     Sufficiency of Facts Alleged

Defendants assert that Green has failed to meet the pleading requirements for a constitutional claim and characterize his claims as "constructed . . . out of bare legal conclusions." ECF No. 17-1 at 6. They further assert that Green has not stated "specific 'circumstances, occurrences and events' . . . attributable to these Defendants to support his bald allegations of constitutional derelictions." *Id.*, quoting *Twombly*, 550 U.S. at 576, n. 3. To the contrary, Green specifically asserts that he told Defendant Hague he feared for his safety when he was ordered to return to general population on March 15, 2020; a statement Green asserts was met with a threat to transfer him to NBCI. The claim against Hague survives analysis under the Rule 12(b)(6) dismissal standard.

Green's claims against the John Doe Defendants and the Shift Control Officers are vague. He provides no explanation as to how these defendants contributed to his injury. The claims against these Defendants shall accordingly be dismissed for failure to state a claim.

B.     Personal Participation – Warden Campbell

Green does not raise any specific claims against Defendant Warden Campbell. Liability under § 1983 attaches only upon personal participation by a defendant in the constitutional violation. It is well established that the doctrine of respondeat superior does not apply in § 1983

claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983); *see also Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001) (no respondeat superior liability in a Bivens suit). Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). Supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

Where, as here, a Defendant is simply named in the caption of the complaint and appears to have been named as a Defendant on the sole basis that he is a supervisor, the claims against him fail. Green has not asserted that he spoke with Warden Campbell or otherwise communicated his fears about returning to general population to Campbell. Accordingly, the claims against Warden Campbell are dismissed.

C.    Eighth Amendment Claim

In order to prevail on an Eighth Amendment claim of failure to protect from violence, Green must establish that Defendants exhibited deliberate or callous indifference to a specific known risk of harm. *See Pressly v. Hutto*, 816 F.2d 977, 979 (4th Cir. 1987). "Prison conditions

may be 'restrictive and even harsh,' but gratuitously allowing the beating or rape of one prisoner by another serves no legitimate penologicial objective, any more than it squares with evolving standards of decency.  Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Farmer v. Brennan*, 511 U.S. 825, 833-34 (1994) (citations omitted).  "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id.* at 837, *see also Rich v. Bruce*, 129 F.3d 336, 339-40 (4th Cir. 1997).

"The Eighth Amendment's prohibition on cruel and unusual punishments imposes certain basic duties on prison officials."  *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016) (citing *Farmer*, 511 U.S. at 832).  Those duties "include maintaining humane conditions of confinement, including the provision of adequate medical care and . . . 'reasonable measures to guarantee the safety of the inmates.'"  *Id.*  "[N]ot every injury suffered by a prisoner at the hands of another translates into constitutional liability for prison officials responsible for the victim's safety." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015).  A two-part inquiry that includes both an objective and a subjective component must be satisfied before liability is established. *See Raynor*, 817 F.3d at 127.

Objectively, the prisoner "must establish a serious deprivation of his rights in the form of a serious or significant physical or emotional injury" or substantial risk of either injury. *Danser v. Stansberry*, 772 F.3d 340, 346–47 (4th Cir. 2014).  The objective inquiry requires this Court to "assess whether society considers the risk that the prisoner complains of to be so grave that it

violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 (1993). A genuine dispute of fact regarding the extent of the injury suffered precludes summary judgment. *Raynor*, 817 F.3d at 128.

Subjectively, a plaintiff must establish that the prison official involved had "a sufficiently culpable state of mind" amounting to "deliberate indifference to inmate health or safety." *Farmer*, 511 U.S. at 834. Evidence establishing a culpable state of mind requires actual knowledge of an excessive risk to the prisoner's safety or proof that prison officials were aware of facts from which an inference could be drawn that a substantial risk of serious harm exists and that the inference was drawn. *Id.* at 837. A plaintiff may "prove an official's actual knowledge of a substantial risk 'in the usual ways including inference from circumstantial evidence" so that "'a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Raynor*, 817 F.3d at 128. Actual knowledge of a substantial risk does not alone impose liability. Where prison officials responded reasonably to a risk, they may be found free of liability. *Farmer*, 511 U.S. at 844.

Defendant Hague asserts he was unaware of a risk of harm to Green when he was returned to general population two days before he was assaulted in his cell by multiple inmates. "[A] prison official who was unaware of a substantial risk of harm to an inmate may nevertheless be held liable under the Eighth Amendment if the risk was obvious and a reasonable prison official would have noticed it." *Farmer*, 511 U.S. at 842. The undisputed evidence establishes that Green informed Hague on March 3, 2020 that he owed money to DMI, an explanation why Johnson assaulted Green. ECF No. 17-5 at ¶ 4. Although Hague maintains that Green did not "express concerns for his safety" (*see id.*) when he explained that he owed money to a STG, Green maintains he refused

housing on March 3, 2020 due to his concern for his safety and received an infraction[3] for doing so. There is no indication on this record that an investigation into Green's assertion that he owed money to the DMI and that his safety was still in peril took place prior to requiring Green to return to general population. This makes Hague's assertion that there was no "communications prior to March 17, 2020 that would support a finding of a credible threat or danger" perplexing at best. This Court finds that there is a genuine dispute of material fact regarding whether Hague's actions in requiring Green to return to general population were reasonable in light of the information provided by Green. The Motion for Summary Judgment as to the Eighth Amendment claim against Lt. Hague is therefore denied.

### Conclusion

Green's claims against Warden Campbell, Five John Does, and Shift Control Officers shall be DISMISSED. Defendant's Motion for Summary Judgment as to the claim against Lt. Hague shall be DENIED. Green is granted 28 days to move for appointment of counsel. A separate Order follows.

_____November 3, 2021_____
Date

_____
GEORGE J. HAZEL
UNITED STATES DISTRICT JUDGE

---

[3]     Absent from this record are any of the disciplinary records made on or about March 3, 2020.